GANS et al. v. AUCHINCLOSS et al.

(District Court, S. D. New York. January 29, 1909.)

ADMIRALTY (§ 60*)—PLEADING.

Where a libel which originally sought to excuse the performance of a condition of a contract by alleging impossibility was held defective and it was amended so that a waiver by the respondents of the performance was alleged and an estoppel by their conduct to avail themselves of the breach of the condition pleaded, *held* the amendment overcame the defect and the libel was good.

[Ed. Note.—For other cases, see Admiralty, Cent. Dig. § 487; Dec. Dig. § 60.*]

(Syllabus by the Judge.)

In Admiralty.

See, also, 166 Fed. 991.

Wheeler, Cortis & Haight, for libellants.

Miller, King, Lane & Trafford (Benjamin A. Morton, and William S. Montgomery, of counsel), for respondents.

ADAMS, District Judge. On the 25th of November, 1908, exceptions to the libel herein were sustained and it was provided that the libel should be dismissed unless properly amended within 20 days. The ground of the decision then was based upon an allegation in the libel that it was impossible to communicate with the master of the vessel involved, the steamship Finland. It was there held that an alleged impossibility of performing the conditions of a contract does not suffice to relieve the shipowners from the fulfilment of a provision requiring the collection of demurrage or an endorsement on the bill of lading before sailing.

Thereafter an amended libel was filed as follows:

"Second. On or about the 20th day of June, 1905, a charter party in writing was entered into between the libelants and respondents whereby the respondents agreed to load in bulk on board a steamship to be thereafter named by the libelants, a cargo of not less than 2,000 tons, nor more than 2,200 tons, of phosphate at Port Inglis anchorage, West coast of Florida, United States, off mouth of Withlacoochee River for transportation to Hamburg, Germany, by the libelants on the said steamship. For the transportation of said cargo respondents agreed to pay to the libelants the sum of Thirteen shillings per ton delivered.

It was further agreed by the respondents in said charter party that the vessel should be loaded at Port Inglis as aforesaid 'at the average rate of 400 tons per weather working day (Sundays and holidays excluded),' commencing 24 hours after vessel was ready to receive cargo and written notice to that effect given to charterers' agents, and should be discharged at Ham

*For other cases see same topic & § NUMBER in Dec. & Am. Digs. 1907 to date, & Rep'r Indexes

burg 'at the rate of 450 tons per weather working day (Sundays and holidays excluded),' and that in case the vessel was longer detained by the charterers demurrage should be paid by them at the rate of eight cents per net registered ton per day for every day the vessel was so detained. Said charter party is hereby referred to and made part of this libel.

Third. Said charter party further contained the following common printed clause:

'All liability of Charterers shall cease on completion of loading, the Captain or owners having an absolute lien on the cargo for all Freight, Dead Freight, Demurrage, &c., due to the vessel under the Charter-Party, but all Demurrage incurred at Port of Loading must be settled before sailing therefrom or endorsed on Bills of Lading, or there shall be no lien or claim for the same.'

Fourth. Pursuant to said charter party the libelants thereafter duly named the steamship Finland, of 1441 tons net register, as the steamship to carry the said cargo, and the said steamship thereafter proceeded to said Port Inglis anchorage, arrived there on September 12th, 1905, at 11 A. M., and was duly entered and tendered to respondents, and written notice that said steamship was ready to receive cargo was given to their agents on September 12th, 1905, at 5 P. M. Lay days began to run pursuant to said charter on September 13th, 1905, at 5 P. M.

Fifth. Thereafter said steamship loaded a cargo of 1900 tons of phosphate, supplied by respondents, which, according to said charter party should have been supplied in four and three-quarter days at the rate of four hundred tons per day, Sundays and holidays excepted, and should, therefore, have been supplied by the 19th day of September, 1905, at 11 A. M., the 17th of September being a Sunday, and no holidays having intervened, at which time lay days began to run. Had said cargo been supplied as required by charter, libelants would have loaded the same on or before September 19th, at 11 A. M., and said vessel would have sailed, but owing to respondents' failure to supply said cargo promptly, as aforesaid, said steamship was detained until the 26th day of September, at 8 A. M., or six days and twenty one hours, for which period libelants became entitled to receive on said 26th day of September, 1905, demurrage at the rate of eight cents per net registered ton for every day said vessel was so detained, which demurrage amounted to $706.09.

Sixth. It proved to be very difficult for the libelants to communicate with the master of the steamship Finland at Port Inglis, owing to the position of said steamship and the inadequacy of the facilities there, and therefore libelants could not, by making reasonable efforts, fully instruct the master of said steamship regarding the indorsement of claims on the bills of lading for demurrage as provided in said charter party. Libelants therefore took up the settlement of the demurrage directly with respondents, before said steamship should sail, so that it might be adjusted without the necessity of indorsing the demurrage on the bill of lading. On or about the 19th day of September, 1905, lay days of the steamer having expired and the loading of said cargo not being begun, the libelants notified the respondents that the steamship was on demurrage from and including that day until said loading should be completed, at the rate provided by said charter party, and that libelants would hold the respondents for said demurrage, although, owing to the difficulty of communicating with the master as aforesaid, said bills of lading might not be indorsed with claims for demurrage, and further notified the respondents that all rights for demurrage were reserved. The said notice was repeated on the 20th day of September, 1905, while the said steamer was still on demurrage. Said notices are annexed hereto and marked Schedules A and B.

The respondents received said notices without objection, made no intimation whatever that they did not assent to the settlement of the demurrage directly by the parties to the charter party without indorsement on the bill of lading, though such notice could easily have been given had respondents so desired, for libelants and respondents were both in New York City. Respondents made no suggestion that they would rely upon the libelants' omission to indorse the demurrage on the bill of lading. Meantime, the loading of said steamship was begun and after several days was completed, and on September 26th, 1905, said steamship sailed, and it thus became impossible for libelants to send a special agent to said vessel and attend to the indorsement of said

demurrage on said bills of lading. By the course of conduct of the respondents, libelants were led honestly to believe that the respondents assented to the waiver of the condition that the demurrage be indorsed on the bills of lading, and respondents by their conduct waived such condition, and are estopped to set up as a defense to this libel that said indorsement on the bills of lading was not made. If respondents had notified libelants when said notices were received that they would insist on such indorsement on the bills of lading, and had objected to a direct settlement of the demurrage by the parties, libelants could and would have taken means to have made such an indorsement on the bills of lading.

Seventh. By the respondents' failure to carry out its contract, as aforesaid, the respondents became liable to pay to libelants the sum of $706.09, with interest thereon from September 26, 1905. Payment of said sum has been demanded but the respondents have refused and still refuse to pay the same, or any part thereof, and said sum is still due and owing from the respondents to the libelants."

Exceptions were filed subsequently to the amended libel as follows:

"The said respondents, John W. Auchincloss and Hugh D. Auchincloss, except to the libel of John H. Gans and Henry Wehner filed herein on the ground that said libel does not state facts sufficient to constitute a cause of action."

The matter has again been elaborately argued by the respective parties. At the time of the first decision the question was, in substance, whether the libellants could excuse themselves for not fulfilling a condition of their contract by alleging that performance was impossible, and it was held that the mere allegation was insufficient and that parties could not be permitted to make a new contract by such an allegation. In the amended libel, however, the libellants allege that by the conduct of the respondents, the libellants were led to believe that the respondents assented to the non-performance of the condition that demurrage be inserted in the bill of lading and waived that condition of the contract and are estopped from setting up as a defense to the libel that the endorsement on the bill of lading was not made.

Instead, therefore, of there being a defect in the libel as was shown at first by the pleading of impossibility of performance, which I thought did not amount to a legal excuse for the failure of the performance of a stipulated condition, now a case is presented of a waiver by the parties entitled to it of the performance of the condition and of an estoppel on their part to avail themselves of the condition.

As it now stands, the libel seems to be good and the exception is overruled.